

# NUMBER 13-24-00210-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF B.C.F. JR., D.E.F., A.R.F., CHILDREN

### ON APPEAL FROM THE 25TH DISTRICT COURT
### OF GONZALES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Longoria, Tijerina, and Peña**
**Memorandum Opinion by Justice Longoria**

Appellant D.F. (Mother) appeals a judgment terminating her parental rights to her children B.C.F., Jr., D.E.F., AND A.R.F.[1] By two issues, Mother challenges the sufficiency of the evidence supporting termination of her parental rights under § 161.001(b)(1)(D) and (E) of the family code and asserts she received ineffective assistance of counsel. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents and children are referred to by their initials or an alias. *See* Tex. Fam. Code Ann. § 109.002(d).

## I.     BACKGROUND

### A.     Removal

The children were taken into possession by the Texas Department of Family and Protective Services (the Department) on February 25, 2023. Prior to removal, the Department had received two referrals alleging the neglectful supervision of the children by Mother. On December 19, 2022, the Department received a referral alleging that D.E.F. had untreated lice for several months, leading to scabbing on her scalp. On February 3, 2023, the Department received a referral alleging that "arguing could be heard through the walls" of Mother and her paramour D.T.'s apartment. The referral further alleged that D.T. had brought "drugs and a gun" into the home and that when law enforcement arrived, methamphetamines were found "on the floor accessible to the children."

In her affidavit in support of exigent removal, Ashley Molina, a caseworker for the Department, averred that after the first referral, she visited the home on January 5, 2023, and noted no scabbing or lice was present on D.E.F.'s scalp. Molina attempted to make contact on February 3, 2023, after the second referral was made, but Mother was not "in town." Mother later brought the children to Molina's office where Mother and Molina discussed the referral related to the drugs and gun in the home. According to the affidavit, Mother denied that the drugs or gun were hers and that when she located the items, she attempted to remove D.T. from her home. Mother told Molina that "while throwing [D.T.'s] possessions outside . . . the bag of methamphetamines broke." Mother indicated that her children were asleep during this incident, which Molina confirmed with law enforcement

2

who responded to the incident. Mother indicated that D.T. would be removed from her home and would not be allowed to return. Molina was unable to speak with the children while they were at her office that day.

On February 7, 2023, Molina went to D.E.F.'s and B.C.F.'s respective schools to meet with them. Neither made any outcry of abuse or neglect. That same day, Molina visited Mother at the residence. Molina's affidavit states that she "did not have any immediate concerns for drugs being used in the apartment."

On February 23, 2023, Molina received "numerous" calls from anonymous people regarding disturbances at Mother's home involving D.T. There were concerns that A.R.F., then two years old, was left alone outside. The next day, Molina confirmed through conversations with D.E.F. and B.C.F. that D.T. had been staying in the home. Mother denied that A.R.F. was left alone outside, and told Molina that D.T. had not been staying with their family. A safety plan was put in place, and Mother agreed to have her cousin A.F. move into the family's home and "supervise all of her contact with the children." On February 25, 2023, A.F. called Molina and stated that Mother allowed D.T. back into the home and would not allow A.F. to be inside the home. A.F. was concerned for the children's safety.

Molina arrived at Mother's residence on February 25, 2023, with law enforcement. When they gained access to the home, there was a smell of marijuana emanating from the home, and Molina observed marijuana on the kitchen counter. With no alternatives to replace A.F. as a safety monitor, the children were removed from Mother's care that day.

3

**B.   Trial**

A bench trial was held over the course of two days via Zoom. On the first day of trial, before evidence was presented, Mother's attorney notified the trial court that Mother was "in agreement to execute a voluntary relinquishment" of her rights. Because trial had commenced, an agreement was made that trial would continue as to the two fathers, without putting evidence on as to Mother. Mother's attorney also indicated that Mother would be "supportive" of the current foster parent adopting all three children. In addition, Mother's attorney asked to be excused for a period of time during the evidence portion of the trial that day due to another trial obligation, which was allowed.

Trial began with testimony from Karen Ortiz Washington, the permanency specialist for the case. Washington's testimony focused solely on both fathers, stating that DNA tests confirmed paternity. Washington did not testify to anything pertaining to Mother.

Prior to the next witness, Mother's counsel was excused for a hearing in another matter. The Department next elicited testimony from Molina. The Department acknowledged that they were not going to "go into too much detail" regarding the removal from Mother's case but that they needed to discuss how it happened. Molina testified to the same facts as laid out in the affidavit for removal. Specifically, Molina gave the dates and general details of the two different referrals received and the communications between Molina and Mother. Molina testified that Mother was dating D.T., that D.T. had a criminal history related to drugs, and that D.T. was on parole. Although the Department advised Mother that she could not have D.T. in the home or near her children, Mother

4

continued her relationship with D.T. and the children were ultimately removed for their safety. The remainder of Molina's testimony focused on her contact with the two fathers.

Darla Sanders, the assigned court appointed special advocate (CASA) for the case also testified on day one of trial. Her testimony was limited to the performance of the service plans by the fathers. She opined that termination of the rights of both fathers was in the best interest of the children. After Sanders testified, the trial court recessed trial "for completion as to [M]other."

Trial resumed approximately three weeks later, at which point, Mother did not relinquish her rights and evidence was presented. The Department recalled Molina and her testimony largely mirrored that of her statements made in her affidavit supporting removal, specifically detailing the events leading to the removal including drugs and a gun in the home, which Mother stated belonged to D.T. Mother advised the Department that she would remove D.T. from her home and would end their relationship; however, Molina testified that Mother continued to be involved with D.T. Molina stated that Mother denied that D.T. was still present in her life but that in speaking with the children, Molina learned that D.T. had been staying at their home. Molina then initiated a safety plan by which a A.F. would stay with Mother to supervise her contact with the children. However, less than twenty-four hours later, A.F. informed Molina that Mother had "taken off with the kids" and D.T. Molina, along with law enforcement, went to the home, where Mother eventually returned. Molina noted that inside the home, marijuana was "laying on the kitchen counter," and there were "belongings that belonged to a man." Molina removed the children that day. Molina explained that Mother's inability to separate herself from D.T.

coupled with the drugs and gun present in the home, constituted conduct that endangered the children.

On cross-examination, Molina acknowledged that she had never personally seen a gun in Mother's home but that she was informed by law enforcement that a gun and methamphetamines were found at the home. Molina agreed that the children appeared healthy, properly dressed, and unharmed. Molina testified that she did not believe there was a concern for domestic violence in this case between Mother and D.T.

Molina clarified that there had been a referral related to an altercation between Mother and D.T. when the children were present in the home, but Molina was told it was a verbal altercation. The altercation was when the methamphetamines and a gun were found in the home. Molina also explained that Mother had a history with the Department predating the referrals that led to removal. Her history included domestic violence episodes, concerns about drugs, and concerns about abuse and neglect.

Washington was also recalled and testified that a family plan of service was created for Mother and that Mother assisted in the creation of the plan, which included: parenting classes, individual counseling, psychological evaluation with any treatment recommended, visitation, obtaining and maintaining a stable income, and random drug testing. Mother did complete the psychological evaluation and "very few" drugs tests. Washington testified that Mother admitted to "smoking marijuana" at the beginning of the case. Mother attended most of the parent-child visitations during the pendency of the case, but she did not successfully complete any of the other services on her plan. Washington stated that Mother failed to comply with her family plan of service and

believed that termination was in the best interests of the children. Washington's opinion was based on Mother's lack of effort and initiative, instability, and inability to care for four children, having just had a baby during the pendency of this case. Because two of the three children who were removed have special needs, Washington expressed that she did not think Mother could provide for the children's needs. Washington explained that there is a "loving and caring family that is able to meet [the children's] needs" who plans to adopt all three siblings. At the time of trial, A.R.F., who was three, was placed in one foster home, and her siblings B.C.F., eight years old, and D.E.F., six years old, were together at Helping Hands Home, a residential treatment center. A.R.F.'s foster parents planned to adopt the three siblings to keep them together.

On cross-examination, Washington explained that Mother had indicated that she could not provide for the children and had wanted to relinquish her rights but ultimately changed her mind. Washington did not believe that Mother had been making positive lifestyle changes and indicated that D.T. was the father of her newborn baby. At the beginning of the case, Mother and D.T. were arrested for possession of drugs and a gun in their vehicle, but Washington was unsure of the status of the criminal case against Mother at the time of trial.

Washington agreed that the children have a connection with Mother and explained that the potential adoptive parents were willing to have contact with Mother to maintain that connection. The children looked forward to visitation, but according to Washington, they never indicated that they would like to return to Mother's care.

Lucia Cobb, a licensed professional counselor with the Department, testified that

Mother was one of her clients. She explained that Mother had five sessions with her, but after Mother failed to attend three sessions and was not responsive, Cobb terminated her sessions. The purpose of Mother's visits with Cobb was to help Mother with "her depression and anxiety so that she could get employment" and to motivate "her to be able to take care of the basic needs for herself and her kids."

Sanders was recalled by the Department and testified that termination was in the best interests of the children because Mother "has been unable to maintain stability to care for even herself." Sanders stated that Mother loves her children but cannot provide for their basic needs, "physical[ly] and emotionally."

In closing statements, Mother's attorney stated:

After conversations and Mom searching her heart, she did decide that she cannot care for her children at this time and that it would be best for them to be with the foster family and potential adoptive family. She made that decision on her own. She recognized she did not complete the service plan, and she did have the intention of relinquishing. However, that did not get executed.

So today I would just ask this Court to find that she did not complete the service plan and it is in the best interest of the children her rights be terminated.

Mother's attorney requested that termination not be done under predicate grounds (D) and (E), in order to allow Mother the opportunity to maintain the connection with her children as offered by the adoptive family.

The trial court found it was in the children's best interest that Mother's rights be terminated, and the trial court terminated Mother's rights pursuant to § 161.001(b)(1)(D), (E), and (O) of the family code. This appeal followed.

## II. PREDICATE GROUNDS

Mother's parental rights were terminated pursuant to multiple predicate grounds, specifically (D), (E), and (O). However, she challenges the trial court's findings under only subsections (D) and (E); she does not challenge the trial court's finding under subsection (O). If, as here, the trial court terminates the parent-child relationship on multiple grounds under § 161.001(b)(1), we may affirm on any one ground because, in addition to finding that termination is in the child's best interest, only one predicate violation under § 161.001(b)(1) is necessary to support a termination order. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re F.B.C.L.*, No. 04-20-00477-CV, 2021 WL 1649221, at *1 (Tex. App.—San Antonio Apr. 28, 2021, no pet.) (mem. op.) ("Only one termination ground—in addition to a best interest finding—is necessary to affirm a termination judgment on appeal."). Accordingly, we affirm the termination as Mother did not challenge the predicate violation under § 161.001(b)(1)(O).

However, we must still consider Mother's issues relating to the sufficiency of the evidence to support the trial court's findings under subsections (D) and (E). Because termination findings under subsections (D) and (E) may serve as the basis for a future termination of parental rights proceeding, the Texas Supreme Court has explained due process requires us to address any appellate issue regarding the sufficiency of the evidence of a trial court's finding under either subsection (D) or (E). *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); *see also In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) ("Only one predicate ground and a best interest finding are necessary for termination," but "due process requires that courts also review termination under

9

Subsections 161.001(b)(1)(D) and (E) even after affirming termination on another ground because of the collateral effects of termination on those grounds.").

## A.    Subsections (D) & (E)

To terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence the parent knowingly placed the children in or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

"Endanger," as used in subsection (D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See SeeIn re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Parental and caregiver illegal drug use and drug-related criminal activity likewise

10

supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id.*

A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *In re M.R.J.M.*, 280 S.W.3d at 502. A child may therefore be endangered when the home environment creates a potential for emotional or physical injury; the injurious conduct does not need to be directed at the child, and the child does not need to suffer injury for the requirements of subsection (D) to be met. *Boyd*, 727 S.W.2d at 533.

"The relevant period for review of conduct and environment supporting termination under statutory ground (D) is before the Department removes the child." *In re R.S.-T.*, 522 S.W.3d at 109 (citing *In re J.O.A.*, 283 S.W.3d at 345). Subsection (D) permits termination based upon only a single act or omission. *Id.*

Under subsection (E), "endangerment" has the same definition as in subsection (D), but the grounds of subsections (D) and (E) are otherwise different. *See Boyd*, 727 S.W.2d at 533. To terminate parental rights pursuant to subsection (E), the Department must prove by clear and convincing evidence the parent engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child[ren]'s physical or emotional well-being." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (mem. op.). Termination under subsection (E) must be

based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The course of conduct may include a parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Scienter is not required for a parent's own acts or omissions; proof of the parent's knowledge is required only when the allegation is the parent placed the child with others who endangered the child. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

Here, the trial court heard evidence relating to Mother's relationship with D.T., that methamphetamines and marijuana were found in the home, and that on one occasion law enforcement located a gun along with methamphetamines in the home. There was also evidence that Mother had previously used drugs in the past and testimony that she smoked marijuana during the pendency of the case. Early in the case, Mother and D.T. had been arrested on a drug and weapon charge as well. The Department detailed Mother's inability to remove herself and her children from D.T., who the Department described as having a criminal history and a history with drugs and guns, and whom Mother blamed for the methamphetamines and gun in the home. There was evidence that Mother and D.T. had several verbal altercations resulting in law enforcement being called. After the Department got involved and ordered Mother to keep D.T. away from the children, there was evidence that Mother continued to allow D.T. into their home and to stay in the home.

Mother missed several random drug tests, failed to complete her family plan of

12

service, was discharged by the Department's licensed professional counselor for failing to appear at her sessions, and according to the Department, made no efforts to make positive changes. The trial court heard testimony that Mother lacked stability and the ability to provide for the needs of her children, especially the two eldest who require a higher degree of care.

When considering the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that Mother knowingly placed the children in conditions or surroundings endangering their well-being. Mother did not end her contentious relationship with D.T., even after she discovered he had brought a gun and drugs into her home. Mother continued to allow her children to be around D.T. *See In re M.R.J.M.*, 280 S.W.3d at 502. There was testimony that Mother had used drugs in the past and at the beginning of the case. *See In re J.T.G.*, 121 S.W.3d at 125. She also missed several drug tests, and the trial court could have inferred that she continued to use drugs. *See In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("The trial court may infer from a refusal to take a drug test that appellant was using drugs."). Accordingly, when considering the evidence in the light most favorable to the trial court's finding, we conclude it is legally sufficient to support the trial court's subsection (D) finding. *See In re J.O.A.*, 283 S.W.3d at 344. We further conclude, when viewing the entire record, the disputed evidence is not so significant to prevent the trial court from forming a firm belief or conviction termination of Mother's parental rights was justified under subsection (D). *See id.* at 345. The evidence is therefore factually sufficient. *See id.*

13

Because Mother allowed the children to be continuously exposed to D.T., drugs, and verbal altercations, the trial court could have also formed a firm belief or conviction that termination was justified under subsection (E). A long history of irresponsible choices is probative evidence that a parent has engaged in conduct that has endangered a child. *See id.*; *In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (reasoning parent's drug use may be considered as establishing endangering conduct under subsection (E)). Molina testified that Mother's history with the Department, before the children were removed included episodes of domestic violence and concerns regarding drugs, abuse, and neglect. The trial court also heard testimony that Mother blamed D.T., a convicted felon on parole, for the presence of methamphetamines, marijuana, and a gun in the children's home. However, though Mother advised the Department that she would end her relationship with D.T. and remove him from the children's home, Mother continued her relationship and allowed D.T. to be present among the children. Mother and D.T. were also arrested for possession of a gun and drugs in a vehicle during the pendency of the case. The trial court heard testimony from the Department that Mother did not engage in actions to better her situation or proactively seek to resolve these issues and she had failed to complete her family plan of service. Viewing the evidence in the light most favorable to the trial court's findings as to subsection (E), we conclude the evidence is legally and factually sufficient. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.W.*, 152 S.W.3d at 205; *In re M.J.M.L.*, 31 S.W.3d 347, 351.

Mother's first issue is overruled.[2]

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By her second issue on appeal, Mother argues that she received ineffective assistance of counsel. Ineffective-assistance-of-counsel claims in parental termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*. *In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003). It requires the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). A party claiming ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to succeed. *In re M.S.*, 115 S.W.3d at 545.

Counsel's performance falls below acceptable levels only when the "representation is so grossly deficient as to render proceedings fundamentally unfair." *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). We give great deference to counsel's choices and indulge "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). The challenged conduct will constitute ineffective assistance only when "the conduct was so

---

[2] We note that Mother also did not challenge the trial court's best interest finding. As such, we do not address the best interest finding in this memorandum opinion.

outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

"Allegations of ineffectiveness 'must "be firmly founded in the record."'" *Lampkin v. State*, 470 S.W.3d 876, 897 (Tex. App.—Texarkana 2015, pet. ref'd) (first quoting *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (and then quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999))). "The standard of review is much more deferential to trial counsel's actions when the claim is asserted for the first time on direct appeal because '[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record,' and because 'trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" *Id.* at 898 n.10 (quoting *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003) (quoting *Bone*, 77 S.W.3d at 836). "When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record 'is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance.'" *Id.* at 898 (quoting *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005)).

Mother argues that counsel was ineffective for absenting herself from the trial proceedings for a period during the first day of trial. Specifically, Mother contends that "[t]here is no conceivable trial strategy that could justify the attorney's lengthy absence from the courtroom, and the amount of inadmissible and highly prejudicial evidence that was introduced in her absence had no doubt affected the outcome of the case." Mother argues that because she was absent from the proceedings, Mother's counsel did not

object to the admission of inadmissible hearsay on day one of trial—specifically "evidence of the neighbor's and children's out-of-court statements to Ms. Molina" and testimony about D.T.'s criminal background.

While Mother argues that the admission of these statements harmed her, merely stating that the evidence harmed her does not overcome the presumption that her counsel's conduct was reasonable or that her counsel's actions were so outrageous that no competent attorney would have engaged in them. *See id.* Mother asserts, without any citation to legal support, that she was harmed by trial counsel's absence during the first day of testimony, but, because Mother had indicated her intent to file a relinquishment of her rights prior to the start of trial, it was agreed on by the parties and the trial court that day one of trial would be focused on evidence related to the termination of both fathers' rights to the children. The Department presented minimal evidence as to Mother on the first day of trial, specifically making note to avoid going into any details except as necessary as it pertained to one or both fathers. As such, we find that Mother's arguments fail to satisfy the first prong of *Strickland*. *See id.* (explaining that counsel's conduct is deficient only if it is "so outrageous that no competent attorney would have engaged in it" and produces a fundamentally unfair trial (quoting *Garcia*, 57 S.W.3d at 440)). We overrule Mother's second issue.

## IV. CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
18th day of September, 2024.

17